Estate of Frederick Webb, The Fall River National Bank, Executor v. Commissioner.
Estate of Webb v. Commissioner
Docket No. 111689.
United States Tax Court
1944 Tax Ct. Memo LEXIS 262; 3 T.C.M. (CCH) 440; T.C.M. (RIA) 44151; May 8, 1944
*262 Harold B. Tanner, Esq., 15 Westminster St., Providence, R.I., and Richard K. Hawes, Esq., 57 N. Main St., Fall River, Mass., for the petitioner. Melvin L. Sears, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding involves a redetermination of a deficiency in petitioner's estate tax of $191,085.53. Petitioner claims an overpayment of tax in the amount of $63,810.39. The only issues presented involve the valuation of stocks in five merchandising and two real estate corporations. Findings of Fact The facts stipulated by the parties are hereby found accordingly. Facts hereinafter recited which are not from the stipulation are facts otherwise found from the record. Petitioner is the duly qualified executor under the will of Frederick Webb, who died a resident of Rhode Island on December 7, 1938. The estate tax return was filed with the collector of internal revenue at Providence, Rhode Island. The companies, the value of whose stock is in question, the number of shares of preferred and common stock therein held by the estate, and the number of shares outstanding are as follows: Preferred
Common
Corporation
Estate
Outstanding
Estate
Outstanding
Cherry & Webb Co. (Fall River)
437
1,250
787
2,250
Cherry & Co., Inc. (New Bedford)
935
3,000
818
2,700
Cherry & Webb Co. (Lawrence)
500
1,000
600
1,210
Cherry & Webb Co. (Lowell)
332
2,000
323
2,070
Cherry & Webb Co. (Providence)
563
2,250
1,933
7,587
Cherry Realty Co.
0
0
16
51
Cherry & Webb Realty Co.
0
0
5,287
11,450
*263 The above-named companies will be hereinafter referred to for convenience by the name of the town in which they are located, except the realty companies. No one of the blocks of the securities listed constitutes a controlling interest in the respective corporations. The sale of one of the blocks of stock to an existing stockholder might give such a purchaser control of the respective corporations. There are no known sales or bid and asked prices for any of the securities here involved either on or near April 7, 1938. On or about May 1, 1942, there was a sale of 200 shares of preferred and 200 shares of common of Lawrence at $95 and $100 per share, respectively, to the Lawrence Company. These sales were made under the terms of a trust created by decedent and were for the purpose of providing funds with which to pay the trust's proportion of Federal estate taxes. The trustee thought that the price represented the fair value of the stock at the time of the sale. This conclusion was based upon a valuation by Chelcie C. Bosland and reflected his estimate of improvement in business since April 7, 1938, at which time he had valued the preferred stock of Lawrence at $90 per share, the common *264 stock at $75 per share. William J. Cherry and decedent began the business of Cherry & Webb about 1894. They first had a store in Fall River. They were joined by George Cherry in organizing the store in New Bedford a few years later. The Providence store was organized by William J. Cherry and decedent. Later they bought out a store which became Cherry & Webb of Lowell. and in about 1912 they organized Cherry & Webb of Lawrence. The stores are operated as individual stores and sell ladies' apparel, specializing at first in cloaks, suits, and dresses, but later adding departments such as hosiery. undergarments, and other apparel. They sell a small amount of men's goods. With the exception of the Providence store, which is rented from outside interests, the stores were located in buildings owned by one or the other of the two realty companies. In 1938 the towns of Fall River, New Bedford, Lowell, and Lawrence were on the down grade, having suffered severe economic reversals. Lowell was particularly depressed. The populations of these towns had declined from 1920 to 1940 and Fall River, New Bedford, and Lowell had been affected by the shift of the cotton textile industry to the South. *265 Lawrence was largely dependent upon the state of the woolen textile industry, which fluctuates greatly and was considerably depressed during most of the twenties, experiencing a revival in the late thirties. The Lawrence location was subject to severe competition from Boston stores. Providence has a more substantial economic background by reason of its diversified industry and business. It has an assured but not rapidly growing economic foundation. Women's apparel stores, because of style changes, require particular skill in merchandising. They are subject to the effects of business cycles, and in depressions they are first to be affected because of the semi-durable nature of apparel. The risk of change in management is present, as well as the competition from the small store not requiring much capital because of its small stock of low-cost goods and low rental overhead. Competition from the "hole-in-the-wall" type of store was increasingly severe in the years leading up to 1938. The stores here in question were built up by the application to the business of earnings resulting from successful operation under good management. The stores have had generally good earnings records. The *266 high peak of earnings in the late twenties fell with the business decline thereafter. Between 1928 and 1938 Fall River. New Bedford, and Lawrence each had one year resulting in a net loss. The earnings per common share, and per preferred share in the case of Lowell, for the periods indicated per year were as follows: Lowell
Fall River
Lawrence
Common
Preferred
Providence
New Bedford
Average Earnings per
share 1937
$ 5.71
$ 9.95
Nominal
$6.40
$11.91
$10.20
Average Earnings per
share 1935-37
9.82
18.12
Nominal
9.86
9.17
12.76
Average Earnings per
share 1932-37
5.32
14.04
Nominal
6.59
4.80
6.28
Average Earnings per
share 1928-37
12.40
10.87
Nominal
9.24
14.70
9.19
After the deficit years all of the stores made substantial recoveries in net income, but by 1938 Lawrence was the only store whose net income approximated the most favorable net income of the period prior to the depression. For the years 1928 through 1938, inclusive, the stores paid dividends on their common stock as follows: Fall River
Lawrence
Lowell
Providence
New Bedford
(2,250 shares)
(1,210 shares)
(2,070 shares)
(7,587 shares)
(2,700shares)
1928
$22,500
0
0
$ 66,500
0
1929
45,000
0
0
133,500
0
1930
45,000
0
0
134,000
0
1931
22,500
0
0
67,000
0
1932
0
0
0
0
0
1933
0
0
0
0
0
1934
0
0
0
30,348
0
1935
0
0
0
37,935
0
1936
0
0
0
45,522
0
1937
0
0
0
45,522
0
1938
0
0
0
45,522
0
*267 For the period 1928 to 1938, inclusive, the stores paid dividends on their preferred stock as follows: Fall River
Lawrence
Lowell
Providence
New Bedford
1,250 shares
1,000 shares
2,000 shares
2,250 shares
3,000 shares
[1]
[2]
8% cumulative
8% cumulative
8% cumulative
8% cumulative
8% cumulative
1928
$15,000
$20,000
0
$30,000
$51,000
1929
15,000
4,000
0
30,000
51,000
1930
15,000
0
0
30,000
12,000
1931
15,000
0
0
30,000
0
1932
15,000
20,000
0
30,000
0
1933
0
16,000
0
9,000
0
1934
0
0
0
18,000
0
1935
0
0
0
27,000
0
1936
30,000
24,000
$24,000
18,000
36,000
1937
10,000
8,000
8,000
18,000
36,000
1938
20,000
8,000
16,000
18,000
24,000
For the period 1928 to 1938, inclusive, preferred dividend requirements were earned the number of times designated as follows: Fall River
Lawrence
Lowell
Providence
New Bedford
1928
4.49
1.29
0.22
9.75
4.54
1929
4.63
def.
1.00
8.56
5.05
1930
5.40
3.88
3.79
8.10
1.38
1931
3.29
3.26
1.92
7.06
def.
1932
def.
0.58
0.54
0.15
0.45
1933
1.37
3.88
0.57
1.04
0.39
1934
2.31
3.04
0.21
3.02
2.08
1935
2.54
3.98
2.19
4.27
2.46
1936
4.80
4.72
2.02
4.30
2.70
1937
2.28
[1] (2.50)
0.81
6.02
2.15
1.18
1938
4.79
1.70
1.61
6.94
1.82
*268 The general supervisory management of the stores was performed by William Cherry and decedent. They and one or two others held all of the stock in the stores. Cherry was the merchandiser and the imaginative, dynamic member of the partnership, and decedent devoted his efforts to the detail management such as maintenance of the records. Between the two the policies of the businesses were determined. At the time of decedent's death Cherry was reaching an advanced age. There was a serious business recession in the Spring of 1938. It was a period of increasing unemployment and great pessimism. This condition was reflected in the stock market in which stock prices fell almost 50 percent between April, 1937, and April, 1938. Slight improvement occurred early in April of 1938, but the condition was still extremely difficult. Common stock in a number of instances had April 7, 1938, market prices which were less than the respective net current assets per share and also below the respective book values per share. On April 7, 1938, the stock market price for the following stocks, the high 1937 stock market price, and the *269 1937 dividends were as follows: Company and
(1937 Dividend)
April 7, 1938
High 1937
Am. Smelting & Refg.
( 5.00)
33
105
Am. Tel. & Tel. Co.
( 9.00)
124
187
Anaconda Cop. Min. Co.
( 1.75)
24
69
Bethlehem Steel
( 5.00)
43
106
Chesapeake & Ohio
( 3.80)
26
69
Chrysler Corp.
(10.00)
40
135
Cons. Edison
( 2.00)
19
50
Du Pont
( 6.25)
96
180
General Electric
( 2.20)
31
65
General Motors
( 3.75)
29
71
Int. Harvester
( 4.00)
55
120
Int. Nickel
( 2.25)
42
73
Montgomery Ward
( 4.90)
28
69
New York Central
(none)
12
55
Socony-Vacuum
( 0.80)
12
23
Texas Corp.
( 2.25)
36
65
Union Carb. & Carb.
( 3.20)
61
111
Union Pacific
( 6.00)
62
149
U.S. Steel
( 1.00)
41
126
Westinghouse E. & M.
( 6.00)
68
168
Purchasers of stock are interested in a company's working capital position, its future earnings and dividends. Where the stock being sold carries a substantial ownership of the company and a voice in its operations, the payment of dividends is not of paramount importance. A potential purchaser is also interested in the marketability of a security and the possibility of gain on its sale. A search by Bosland of apparel stores for *270 whose stock there was a market disclosed, after consideration of some 120 companies, seven ladies' apparel stores comparable to those of petitioner. The qualifications for such stores were that they handle wearing apparel exclusively (that is, they must not be department stores); that they have earning records disclosing not more than two years of deficits in the last ten years; and that their stock have a market quotation. The stores primarily comparable and their economic history in so far as pertinent are as follows: (Adjusted to Common Stock Outstanding Jan. 31, 1938) Calendar Year
Blauner's (1911)
I. Magnin & Co. (1876)
Phila. & 26 stores
San Fran. & 8 Branches
Sales
Per Share
Sales
Per share
(000)
Earn.
Div.
(000)
Earn.
Div.
1928
585
4.32
0.60
9,487
2.87
1.00
1929
725
5.10
1.20
10,984
2.68
1.38
1930
4.65
a 2.00
10,090
1.94
1.50
1931
Not
2.24
a 2.00
8,813
0.80
1.33
1932
Stated
0.95
1.00
6,706
1.14
0.33
1933
0.33
1.00
6,714
0.42
0
1934
2.00
1.00
7,915
0.68
0.40
1935
1.34
1.00
8,989
1.15
0.47
1936
10,621
2.18
1.00
10,289
2.02
1.50
1937
11,426
1.08
1.00
10,659
1.55
1.00
Current Assets 1/31/38 (000)
1,530
4,633
Current Liab. 1/31/38 (000)
502
1,021
Net Current Assets
1,028
3,612
Cash (000)
471
264
Mkt. Value of Sec. Owned (000)
196
240
Cash Value of Life Ins. (000)
111
214
Tang. Book Value per Share Common
8.60 16.70
11.50
Net Current Assets per Share
nil
9.50
Price of Stock 4/7/38
10 1/2
9 1/4
No. of Common Shares out 1/31/38
121,937
263,145
Stock quoted on
N. Y. Curb
San F. S.E.
Capital Structure (000)
Long term debt
Adjusted
Preferred Stock
98
1,079
1,164
Common & Surplus
2,033
1,052
3,043
2,131
2,131
4,207
Real Estate Owned
None
None
None
*271 (Adjusted to Common Stock Outstanding Jan. 31, 1938) Calendar Year
Roose Bros. (1865)
Best & Co. (1879)
Cal. 9 stores
New York & 9 Branches
Sales
Per Share
Sales
Per Share
(000)
Earn.
Div.
(000)
Earn.
Div.
1928
5,041
4.15
2.50
13,346
3.26
1.50
1929
5,413
3.73
2.50
14,614
4.20
1.63
1930
4,952
2.78
2.50
15,098
4.15
2.00
1931
4,450
0.54
1.66
13,822
3.02
2.00
1932
3,266
3.01
0.20
11,131
1.05
0.50
1933
3,392
0.69
0
11,208
2.33
0.25
1934
3,866
1.51
0
12,543
3.14
1.25
1935
4,512
3.44
1.00
13,329
3.73
2.00
1936
5,081
3.62
2.75
14,945
4.21
2.63
1937
5,587
3.59
1.88
16,193
4.02
3.00
Current Assets 1/31/38 (000)
2,489
4,937
Current Liabilities 1/31/38 (000)
696
890
Net Current Assets
1,793
4,047
Cash (000)
313
1,061
Mkt. Value of Sec. Owned (000)
590
Cash Value of Life Ins. (000)
44
312
Tang. Book Value per Share Common
18.70
32.00
Net Current Assets per Share
10.75
10.20
Price of Stock 4/7/38
13 1/4
31 1/4
No. of Common Shares out 1/31/38
73,704
300,000
Stock quoted on
San F. S.E.
N. Y. S.E.
Capital Structure (000)
Long term debt
650
Preferred Stock
1,000
346
Common & Surplus
1,373
9,614
2,373
10,600
Real Estate owned
None
(a) 5,178
*272 (Adjusted to Common Stock Outstanding Jan. 31, 1938) Calendar Year
Lerner Stores Corp.
Fashion Co. (1914)
(1918)
Chain. 159 Stores
Col. Ohio
Sales
Per Share
Sales
Per Share
(000)
Earn.
Div.
(000)
Earn.
Div.
1928
12,104
1.52
0
2,165
3.08
no. inf.
1929
19,077
3.01
0.25
2.132
2.23
0.50
1930
25,294
2.92
1.00
2,066
2.36
2.00
1931
26,077
0.47
0.75
1,805
0.50
1.50
1932
*
1,410
0.80
0.05
1933
22,088
2.34
0
1,337
0.69
0
1934
28,093
3.70
0
1,521
1.17
0
1935
32,216
4.56
1.00
1,574
1.39
0.50
1936
37,178
5.18
2.97
1,820
1.90
1.50
1937
39,551
4.65
2.47
1,933
1.68
1.88
Current Assets 1/31/38 (000)
5,522
459
Current Liabilities 1/31/38 (000)
1,505
142
Net Current Assets
4,017
317
Cash (000)
2,321
101
Mkt. Value of Sec. Owned (000)
15
Cash Value of Life Ins. (000)
29
Tang. Book Value per Share Common
15.90
21.00
Net Current Assets per Share
nil
6.20
Price of Stock 4/7/38
21.
15 bid
No. of Common Shares Out 1/31/38
400,000
34,015
Stock quoted on
N. Y. S.E.
O.C.
Capital Structure (000)
Long Term Debt
1,221
6
Preferred Stock
3,200
100
Common & Surplus
6,379
716
10,800
822
Real Estate Owned
(a) 2,553
(a) 377
*273 (Adjusted to Common Stock Outstanding Jan. 31, 1938) Calendar Year
Mangel Stores Corp. (1916)
Chain 110 Stores
Sales
Per share
(000)
Earn. $5 P.D.
(Issue
1928 *
26.70
1929)
1929
10,600
13.08
4.88
1930
9,987
1.54
6.50
1931
9,357
14.60
0
1932
6.637 *
0
1933
6,560
13.22
0
1934
8,544
18.88
0
1935
8,666
10.42
0
1936
9,105
13.38
5.00
1937
8,985
8.40
5.00 * Not reported.
Current Assets 1/31/38 (000)
1,329
Current Liabilities 1/31/38 (000)
628
Net Current Assets
701
Cash (000)
522
Mkt. Value of Sec. Owned (000)
Cash Value of Life Ins.
Tang. Book Value per Share Common
pfd 88.00
Net Current Assets per Share
pfd 35.60
Price of Stock 4/7/38
pfd 45
No. of Common Shares out 1/31/38
pfd 17,500 par 25
177,500
Stock quoted on
N. Y. Curb
(com)
Capital Structure (000)
Long term debt
77
Preferred stock
438
Common & Surplus
1,104
1,619
Real Estate Owned
(a) 171
Blauner's has its main store in Philadelphia and operates a chain in the eastern States under the name of Wilbur-Rogers. Some of these chain stores are located in New England.
*274 I. Magnin & Co. emphasizes style and exclusiveness, and obtains high prices for quality merchandise. Its branches are operated in various cities along the Pacific coast. Roos Bros., Inc., also operating along the Pacific coast, caters to college students, and emphasizes style. In addition to women's clothing, it carries a line of men's clothing. Best & Co., Inc. is able, because of the prestige of its name, to get high prices for its merchandise. Lerner Stores Corp. is one of the new type of chain clothing stores, with stores in various parts of the East and Middle West. It handles fast-moving merchandise. It usually uses not more than two floors in a building, makes great efforts to cut costs, has no advertising, minimum service, and no charge accounts. Its goods are sold on a price and style basis. Most apparel stores do business on credit. The Cherry & Webb stores have big credit accounts. The Fashion Co. more closely approximates the size of the Cherry & Webb stores. Columbus, Ohio, where it is located, is a city with substantially the same diversified industrial background as Providence, and in addition is the State capital and a university town. Certain other stores are somewhat *275 comparable. Franklin Simon Co. was successful during the life of the founder, but after his death it never recovered its earning power. Although Outlet Co., Lincoln Stores, Kennedy's, and Gilchrist Co. are located in the same areas as the Cherry & Webb stores they are not strictly comparable because they have different risks involved by reason of the merchandise handled. The Lincoln stores are a chain located throughout New England. They have a store in Lowell and one in New Bedford. They emphasize price and fast-moving merchandise rather than quality and style. Kennedy's specializes in men's clothing. Gilchrist does a heavy credit business and tends to emphasize price and rapid turnover rather than quality. Bullock's is a wellknown Los Angeles store which emphasizes women's wear. It has a Hollywood store which deals exclusively in women's wear. The ratios of market prices for common stocks to average earnings of such stores for 1, 3, 6, and 10-year periods ending in 1937 are as follows: 1 year
3 years
6 years
10 years
Primary Companies:
(1937)
(1935-37)
(1932-37)
(1928-37)
Blauner's
9.75
6.86
8.04
4.34
Magnin (I.) & Co.
5.96
5.86
11.80
7.13
Roos Bros., Inc.
3.70
3.80
8.05
6.28
Best & Co., Inc.
7.77
7.83
10.15
9.44
Lerner Stores Corp.
4.52
4.38
Fashion Co.
8.95
9.05
14.85
10.56
Average multiple (earnings to price) =
6.78
6.30
10.58
7.55
Average decimal (earnings / = price)
.1475
.1587
.0945
.1325
Mangel Stores(pfd.)(earnings to price)
7.18
5.62
Average including Mangel Stores (pfd.)
and excluding Best & Co., Inc.: Average (earnings to price) =
6.68
5.93
10.69
7.08
Average (earnings / price)
.1497
.1686
.0936
.1412
Secondary Companies: Outlet Company
9.09
8.46
9.75
7.34
Lincoln Stores
8.60
7.73
9.34
Kennedy's
2.95
Gilchrist Co.
4.57
3.92
14.90
8.31
Bullock's
6.33
6.16
10.70
10.65
Arnold Constable
8.00
7.05
12.70
29.90
Russek's Fifth Ave.
8.00
5.62
9.40
9.50
Oppenheim Collins
4.66
def.
def.
3.44
Average (earnings to price)
6.53
6.49
11.13
11.52 8.91
(median)
Average (earnings / price)
.1531
.1540
.0898
.0868.1122
(median)
*276 The second average above shown, including Mangel and excluding Best, is designed to show the effect of accumulated arrearages of preferred stock which was a factor in the Mangel stores. A capitalization of the companies here in question at the rates above indicated for the primary companies adjusted for Mangel and Best discloses the following valuation for common stock for the periods indicated: New
Fall River
Lawrence
Lowell
Providence
Bedford
1937
38.14
66.46
Nominal
80.75
68.14
1935-1937
58.24
107.47
Nominal
57.78
75.68
1932-1937
68.70
150.00
Nominal
53.54
67.09
1928-1937
98.80
76.98
Nominal
116.90
64.37
Average
65.97
100.25
Nominal
77.24
68.82
Decedent spent most of his time in the Fall River store where he made his headquarters. Lawrence suffered a considerable loss in 1937 due to a bank failure. The loss was charged off against earnings for tax purposes. Such a loss is a nonrecurring item and effect can be given to it by adding back one-half of the loss into earnings. Fall River balance sheets disclose the following: Common
Pref.
and
Secu-
Total
Cal.
Stock
Surplus
Total
Good
Inven-
rities
Current
Yr.
x
x
Capital
Will
tories
at Cost
Assets
1928
$187,500
$122,700
$310,200
$21,875
$89,562
$ 58,310
$376,309
1929
187,500
134,135
321,635
21,875
72,256
88,298
383,838
1930
187,500
155,326
342,826
21,875
72,754
96,094
396,353
1931
187,500
167,117
354,617
21,875
59,367
96,082
379,608
1932
187,500
147,426
334,926
21,875
49,801
96,082
305,038
1933
187,500
167,924
355,424
21,875
40,830
96,082
353,992
1934
187,500
202,673
390,173
21,875
44,294
96,082
371,959
1935
125,000
228,076
353,076
0
58,299 * 86,450
359,134
1936
125,000
245,089
371,089
0
66,150 * 106,065
419,057
1937
125,000
258,929
383,929
0
52,388 * 80,230
399,680
1938
125,000
292,981
417,981
0
48,346 * 127,758
460,339
*277 Net
Current
Work-
Cal.
Liabil-
ing
Yr.
ities
Capital
1928
$ 96,796
$279,513
1929
101,843
281,995
1930
90,142
306,211
1931
68,212
311,396
1932
56,210
248,828
1933
76,630
277,362
1934
53,040
318,919
1935
61,306
297,828
1936
78,182
340,875
1937
66,382
333,298
1938
77,905
382,434
New Bedford balance sheets disclose the following: 1928
$300,000
$ 38,078
$338,078
0
$76,124
$ 48,810
$329,304
1929
300,000
107,257
407,257
0
79,126
48,810
357,942
1930
300,000
128,374
428,374
0
91,837
26,660
261,295
1931
300,000
108,182
408,182
0
121,740
26,660
266,188
1932
300,000
119,030
419,030
0
89,251
26,660
269,015
1933
300,000
128,382
428,382
0
74,526
29,460
284,909
1934
300,000
178,453
478,453
0
64,673
22,660
361,991
1935
300,000
237,622
537,622
0
67,757
* *279 17,122
412,800
1936
300,000
266,318
566,318
0
77,109
* 21,800
448,142
1937
300,000
281,864
581,864
0
65,087
* 62,031
481,075
1938
300,000
303,216
603,216
0
71,881
* 96,300
518,424
1928
$ 86,798
$242,506
1929
52,944
304,998
1930
168,908
92,387
1931
141,988
124,200
1932
120,756
148,259
1933
113,123
171,786
1934
125,655
236,336
1935
108,430
304,370
1936
95,555
352,587
1937
102,694
378,381
1938
99,712
418,712
*278 Providence balance sheets disclose the following: Cal.
Preferred
Common &
Total
Good
Securities
Yr.
Stock
Surplus [a]
Capital
Will
Inventories
at Cost
1928
$375,000
$ 870,283
$1,245,283
$131,250
$127,300
$662,004
1929
375,000
967,665
1,342,665
131,250
109,891
782,382
1930
375,000
1,355,138
1,730,138
131,250
104,117
847,787
1931
375,000
1,162,356
1,537,356
131,250
102,619
904,395
1932
225,000
1,125,934
1,350,934
78,750
82,375
694,590
1933
225,000
1,134,114
1,359,114
78,750
73,182
591,950
1934
225,000
1,133,983
1,358,983
78,750
87,568
571,926
1935
225,000
1,141,932
1,366,932
78,750
90,840
[*] 367,000
1936
225,000
1,169,069
1,394,069
78,750
103,056
[*] 429,500
1937
225,000
1,206,008
1,431,008
78,750
89,556
[*] 433,568
1938
225,000
1,285,200
1,510,200
78,750
87,536
[*] 718,000
[x] No allowance made for preferred arrears which on Jan. 31, 1938 were $208,000. [*] Securities at Market Value. [a] Based on securities at cost. Market price of securities in 1937 $284,000 below cost.
Cal.
Total Current
Current
Net Working
Yr.
Assets
Liabilities
Capital
1928
$1,191,911
$183,160
$1,008,751
1929
1,333,477
207,631
1,125,846
1930
1,426,826
202,774
1,224,052
1931
1,545,262
201,281
1,343,981
1932
1,243,784
111,285
1,132,499
1933
1,334,086
106,800
1,227,286
1934
1,409,914
191,111
1,218,803
1935
1,237,093
132,658
1,104,435
1936
1,382,841
187,779
1,195,062
1937
1,228,687
167,717
1,060,970
1938
1,290,955
160,468
1,130,487
*280 The fair market value on April 7, 1938, of the 935 preferred shares and 818 common shares of the New Bedford Co. owned by the decedent was $156,800, and of the various other stocks in question per share assuming a reasonable period of liquidation was as follows: Corporation
Preferred
Common
Fall River
95
70
Lawrence
95
110
Lowell
75
1
Providence
105
85
Income and balance sheet data with reference to the Cherry Realty Company is as follows: Calendar
Investments
Year
Net Worth
Land
Bldgs. Gross
Bldgs. Net
Cash
at Market
1933
$389,071
$168,253
$210,898
$199,299
$17,510
0
1934
380,186
168,253
210,898
194,026
6,334
0
1935
387,405
168,253
210,898
188,782
31,731
0
1936
394,578
168,253
210,898
183,538
24,944
$23,048
1937
401,908
168,253
210,898
178,294
27,664
25,873
1938
411,219
168,253
210,898
173,050
41,806
29,140
Calendar
Net Working
Rental
Int. &
Depre-
Net
Divs.
Year
Capital
Income
Div. Inc.
Salaries
ciation
Income
on Com.
1933
$21,520
$30,000
$ 357
$ 0
$6,327
$13,801
$20,400
1934
17,907
30,333
288
15,950
5,272
1,315
10,200
1935
30,370
34,000
22
12,750
5,244
7,219
0
1936
46,197
34,000
457
12,750
5,244
7,172
0
1937
51,666
34,000
890
12,750
5,244
7,330
0
1938
68,486
34,000
1,070
11,250
5,244
10,513
5,100
*281 Income and balance sheet data for Cherry & Webb Realty Company for the years indicated are as follows: Calendar
Investments
Year
Net Worth
Land
Bldgs. Gross
Bldgs. Net
Cash
at Cost
1933
$1,082,588
$528,500
$516,500
$402,870
$18,925
$117,778
1934
1,081,444
528,500
516,500
392,540
16,057
139,428
1935
1,081,178
528,500
516,500
382,210
23,875
141,831
1936
1,077,714
528,500
516,500
371,880
28,218
* 205,755
1937
1,087,981
528,500
516,500
361,550
49,287
* 153,594
1938
1,090,900
528,500
516,500
351,220
37,969
* 189,562
*282 The Realty Companies owned stores that are located in cities other than Providence. The Cherry Realty Company owns the old part of the New Bedford store; a new part of the store was constructed by the store itself. Cherry & Webb Realty Co. owns the store buildings used by Fall River, Lawrence, and Lowell. The Cherry Realty Co. leases its property to New Bedford on a net rental basis. The rentals paid by the stores to the Realty Companies are comparatively stable and are based on contracts which call for a fixed payment. All the store properties are in comparatively good locations, being in downtown shopping districts. The Cherry Realty Co. was organized in 1931. The salaries paid the executives were paid for carrying on the administrative work of the Realty Companies. The salaries have been approved by the Bureau of Internal Revenue. Most of the buildings owned by Cherry & Webb Co. in Lowell, Lawrence, and Fall River are fairly old buildings, but well located. While the buildings are well located in their respective cities, the area presents a declining market. The buildings are all specialized buildings. Modern trends in merchandising make it difficult to rent more than one or *283 two floors to new types of stores. The major element or value is the continued occupancy of the buildings by the Cherry & Webb stores. The stores are rented in such a way that it is quite likely that their income will be somewhat more stable than the average real estate security. On April 7, 1938, real estate securities were seriously depressed. Such securities had one of the worst records of any type of securities in the depression of 1930. The Emmett Baker Index of Real Estate Bond Prices put the price at about 33 cents on the dollar for $200 of real estate bonds based on real estate properties in eastern cities. Real estate securities were one of the most difficult to dispose of in the period in question. There were a number of such securities which had market values on or about April 7, 1938, which were a small percentage of book value. Securities of three Boston companies of this type were selling on a five-year average yield of between 14 and 16 percent. The fair market value per share on April 7, 1938, of the realty companies' stocks were as follows: Cherry Realty Co.
$4,000.
Cherry & Webb Realty Co.
65.
Opinion This proceeding calls exclusively for a valuation *284 of securities forming part of decedent's estate. All of the property had similar characteristics, in that it consisted of preferred and common shares of closely-held corporations engaged in businesses actively participated in by decedent and concerned directly or indirectly in the retail sale of women's apparel. It is thus reasonable to approach the process of valuation as a generally single problem and to apply a more or less comparable formula to each block of stock. The difficulty presented is how to evolve that formula in order to arrive at a solution of the problem best calculated to supply the necessary values. There is, of course, no easy road or readily ascertainable rule of thumb for dealing with the difficult questions of fact encompassed in the generic process of reducing to particular situations such broad phrases as fair market value, or the price at which an article would change hands between a willing buyer and a willing seller. Both parties are in accord that no one factor should be considered to the exclusion of others. The figures set forth in our findings embodying our conclusions of fair market value in each instance are the result of our best endeavor to appraise *285 all of the relevant circumstances. We have selected for discussion here only certain aspects of that procedure as representing the elements particularly in controversy without attempting to enumerate every consideration receiving our attention. Having as a point of departure the earning history of the respective securities, one of the most difficult questions in a valuation case is the selection of an appropriate rate of capitalization. On this point the testimony of one of petitioner's opinion witnesses is of great assistance and renders a much more valuable contribution than is normally to be found in cases of this nature. The material compiled and presented by him deals with the average ratio between earnings and market price of the stock of corporations conducting businesses similar to that carried on by decedent's companies during various periods prior to the basic date. An average of those ratios for an average of the periods, when applied to the earnings of the common stocks in issue, results in figures appearing in our findings which as a fundamental premise seem to us to be as carefully computed and as soundly grounded as is reasonably possible in a case of this kind. See *286 Revenue Act of 1943, section 501, amending section 811, Internal Revenue Code. In arriving at his conclusions, however, petitioner's witness adjusted the resulting figures for various collateral factors. It is in this process that we have been unable to concur. Some of the elements normally calling for consideration in appraising securities are in this instance largely discounted already by the method adopted; others strike us as actually indicating an enhancement in value rather than the reverse. For example, the depressed condition of securities markets as a whole is reflected in the selling prices of the stock used as comparatives. Current prices have been given four times the effect of earlier ones by the method used, since the final figure is an average of the four periods selected, and the most recent year is the only one which appears in each. Likewise, any downward earning trend is discounted by the use of a similarly computed average of earnings and by the consequent quadruple emphasis on the most recent year's business. And for a parity of reason peculiar business conditions in the respective localities are offset by the selection of comparative stores in various places *287 throughout the country which in some instances at least admittedly indicated comparable trends. On the other hand, such factors as capital structure, funded debt, asset value, and ratio of quick assets to current liabilities, to business volume, and to fixed assets, are preponderantly advantageous. They represent conditions more favorable to the companies being valued than to the comparatives. These considerations require, to our way of thinking, an upward adjustment of the basic figures rather than the reverse, and account for the somewhat higher values at which we have arrived in compiling our findings. In the case of the New Bedford store we have found a value for the total holdings of the estate, rather than for each individual share. The peculiar situation existing in that instance with respect to arrearages in preferred dividends makes it extremely difficult to determine whether future treatment will incline toward the benefit of the preferred shareholders on the one hand or of the common shareholders on the other. As an illustration, petitioner's witness arrived at his figures by making the assumption that the arrcars would be paid off immediately by the issuance of sufficient *288 common shares, thereby diluting the earning power of the outstanding common. This, of course, is manifestly a speculation. There were liquid assets on hand which for all that appears from the record might have been used to pay off in cash or in kind a large part, if not all, of the preferred dividends. On the other hand, the management might choose, with the cooperation of the preferred shareholders, to pay off preferred arrearages out of current earnings, thereby preserving the total earning power of the company and enhancing the prospects of the common stock. Since, however, the decedent owned a block of stock consisting of both common and preferred shares in fairly equal proportions, and since our problem is to value the property of the estate and not necessarily any individual shares, we have arrived at what we think is a fair minimum value for the entire block which in our opinion would attach irrespective of what course the management of the company might elect to pursue. The stock of the two realty companies presents a further complication. Net earnings for the five-year period shown by the record were radically diminished by the payment of officers' salaries at a rate which *289 petitioner's witness candidly recognized as excessive. The only method for ascertaining the true earning power of these shares is accordingly to add back the overpayments for purposes of computation, notwithstanding that the salaries have been approved by respondent for income tax reporting. Here again, the approach employed by petitioner's witness is persuasive, but, as in the case of the other securities, we regard his final result as somewhat too favorable to petitioner. Considering, among other things, the high asset value, assured return, and ease of doing business, we believe such adjustments as we have made to be necessary to arrive at a figure which still truly represent the fair market values involved. Decision will be entered under Rule 50. Footnotes
1. Preferred dividend requirement $10,000 per year for 1935 and subsequent years. ↩
2. Preferred dividend requirement $18,000 per year for 1933 and subsequent years.↩
1. After adding back one-half loss on bank deposit of $21,264.↩
a. Plus 3% stock.↩
a. After depreciation↩
*. Not Reported ↩
a. After depreciation.↩
a. After depreciation↩
x. No allowance made for Preferred Arrears↩
*. Securities at Market Value Lawrence balance sheets disclose the following: 1928
$100,000
$ 9,557
$109,557
0
$37,422
0
$111,599
1929
100,000
(1,279)
98,721
0
44,381
0
106,265
1930
100,000
30,650
130,650
0
48,135
0
140,989
1931
100,000
56,842
156,842
0
36,322
0
148,606
1932
100,000
41,461
141,461
0
29,327
0
143,114
1933
100,000
72,600
172,600
0
27,143
5,000
182,834
1934
100,000
80,980
180,980
0
30,137
23,695
203,831
1935
100,000
112,875
212,875
0
34,652
Securities at Market Value Lowell balance sheets disclose the following: Common
Pref.
and
Secu-
Total
Cal.
Stock
Surplus
Total
Good
Inven-
rities
Current
Yr.
[x]
[x]
Capital
Will
tories
at Cost
Assets
1928
$200,000
($105,458)
$ 94,542
0
$67,932
0
$168,052
1929
200,000
(89,424)
110,576
0
59,530
0
174,828
1930
200,000
(28,798)
171,202
0
52,148
0
172,366
1931
200,000
(2,385)
197,615
0
51,998
0
158,682
1932
200,000
1,931
201,931
0
38,897
0
148,602
1933
200,000
6,806
206,806
0
28,258
0
150,804
1934
200,000
5,902
205,902
0
32,180
0
154,865
1935
200,000
35,986
235,986
0
43,754 [*] 16,000
207,550
1936
200,000
39,931
239,931
0
46,262 [*] 22,200
228,448
1937
200,000
41,414
241,414
0
42,981 [*] 19,000
239,484
1938
200,000
75,354
275,354
0
41,322 [*] 45,738
260,339
Net
Current
Work-
Cal.
Liabil-
ing
Yr.
ities
Capital
1928
$219,127
(51,075)
1929
199,568
(24,740)
1930
127,601
$44,765
1931
76,698
81,984
1932
51,348
97,254
1933
38,172
112,632
1934
39,196
115,669
1935
48,655
158,895
1936
49,610
178,838
1937
52,466
187,018
1938
63,674
196,665
* 34,630
247,360
1936
100,000
126,715
226,715
0
41,676
* 34,810
261,704
1937
100,000
128,120
228,120
0
47,711
* 28,743
247,727
1938
100,000
130,149
230,149
0
38,595
* 54,900
256,141
↩
1928
$32,929
$78,670
1929
65,685
40,580
1930
60,668
80,321
1931
35,411
113,195
1932
41,503
101,611
1933
46,168
136,666
1934
54,119
149,712
1935
55,202
192,158
1936
56,903
204,801
1937
43,188
204,539
1938
50,960
205,181
*. Securities at market value.
Calendar
Net Working
Int. &
Depre-
Net
Dividends
Year
Capital
Rents
Div. Inc.
Salaries
ciation
Income
on Com.
1933
$151,188
$70,080
$ 5,463
$15,000
$10,330
$33,264
$45,800
1934
160,404
70,080
10,666
30,000
10,330
33,236
34,350
1935
170,468
73,580
7,385
30,000
10,330
34,083
34,350
1936
229,736
70,750
9,092
30,000
10,330
30,887
34,350
1937
197,098
72,760
8,738
30,000
10,330
33,167
22,900
1938
220,391
71,010
7,813
$1200 of this amount in question by the Bureau of Internal Revenue.
a↩ 22,000
10,330
37,283
34,350